IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RAFAEL GUSMAN,                          :
                                        :
              Plaintiff                 :   CIVIL NO. 4:CV-04-2339
                                        :
        v.                              :   (Judge Jones)
                                        :
BUREAU OF PRISONS, et al.,              :
                                        :
              Defendants                :

## **ORDER**

## **March 14, 2006**

## **Background**

Plaintiff, Rafael Gusman ("Plaintiff" or "Gusman"), an inmate formerly confined in the Federal Correctional Institution, in Allenwood, ("FCI-Allenwood"), Pennsylvania[1], filed this Bivens[2] styled civil rights action pursuant to 28 U.S.C. § 1331. He claims that Defendants at FCI-Allenwood were deliberately indifferent to his medical treatment for an ear infection. Named as Defendants in the complaint are the Bureau of Prisons ("BOP");

---

1. Plaintiff is currently housed in the Schuylkill Federal Correctional Institution, in Minersville, Pennsylvania.

2. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). Bivens stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978).

the FCI-Allenwood Department of Medical Services; and the following current or former FCI-Allenwood employees: S.A. Yates, former Warden, Francisco Feliz, Health Services Administrator; Robert Migliorino, former Clinical Director; Francisca Terrero-Leibel, former Physicians Assistant; and Ernesto Roces, Physicians Assistant.

Presently pending before the Court is Defendants' Motion to Dismiss or, in the alternative for Summary Judgment.  (Rec. Doc. 22).  The Motion has been fully briefed and is ripe for disposition.  For the reasons that follow, Defendants' Motion for Summary Judgment will be granted.

**<u>Standard of Review</u>**

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment " . . . forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "[T]his standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of

material fact."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis

in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect

the outcome of the case under applicable substantive law.   Anderson, 477 U.S. at 248;

Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).   An issue of material

fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.   Anderson, 477 U.S. at 257; Brenner v. Local 514, United

Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir.

1991).

When determining whether there is a genuine issue of material fact, the court must

view the facts and all reasonable inferences in favor of the nonmoving party.   Moore v.

Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d

599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d

Cir. 1988).   In order to avoid summary judgment, however, the nonmoving party may not

rest on the unsubstantiated allegations of his or her pleadings.   When the party seeking

summary judgment satisfies its burden under Rule 56(c) of identifying evidence which

demonstrates the absence of a genuine issue of material fact, the nonmoving party is

required by Rule 56(e)[3] to go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

_____

3.  Gusman was provided with copies of M..D. Pa. Local Rules 7.1 through 7.8, Local Rule 26.10, and Federal Rule of Civil Procedure 56(e).  In relevant part, Rule 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Local Rule 7.4 provides in relevant part:

> All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

Rec. Doc. 3, Standing Practice Order.

facts immaterial." <u>Celotex</u>, 477 U.S. at 323.  <u>See</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992).

## **Statement of Facts**

From the pleadings, declarations, and exhibits submitted therewith, the following facts can be ascertained as undisputed.

On January 17, 2003, Gusman was seen by PA Ernesto Roces for complaints of left ear pain.  PA Roces diagnosed him with otitis media, the presence of fluid in the middle ear, and prescribed Bactrim DS, Tylenol, and Benadryl.  (Rec. Doc. 24, Ex. 1, Declaration of Russell Hendershot, Medical Director at FCI-Schuylkill).  On January 24, 2003, Gusman was seen by PA Reid for ear pain.  (Rec. Doc. 24, Medical Records at 13).  Reid diagnosed Gusman with otitis serous, the presence of fluid in the middle ear with effusion.  <u>Id.</u>  Reid advised Gusman to finish the previously prescribed antibiotics and further prescribed Actifed.  <u>Id.</u>

On January 31, 2003, in response to Gusman's request to be seen, Gusman was examined by PA Francisca Terrero-Leibel.  (Rec. Doc. 24, Medical Records at 14).  He complained of pain and that he could not hear from his left ear.  <u>Id.</u>  He also complained that his pain medication was not working.  <u>Id.</u>  PA Terrero-Leibel diagnosed Gusman with

possible otitis externa, inflammation of the external auditory canal, and prescribed Cortisporin ear drops.  Id.

On February 7, 2003, Gusman was seen by PA Terrero-Leibel for a follow-up on his ear pain.  (Rec. Doc. 24, Medical Records at 15).  Gusman stated that he "still has pain in AM."  Id.  Terrero-Leibel diagnosed Gusman with possible otitis media, and prescribed Amoxicillin and Motrin.  Id.  On February 21, 2003, Gusman was seen by FCI-Allenwood Clinical Director, Dr. Migliorino, for a follow-up on his left ear.  (Rec. Doc. 24, Medical Records at 15).  Dr. Migliorino determined that Gusman's left and right ears were within normal limits, except for tenderness to the touch of the canal floor and ostia.  Id.  Gusman admitted to Dr. Migliorino that he had inserted Q-tips into his ear.  Id. Dr. Migliorino diagnosed Gusman with otitis exteran, prescribed Cortisporin ear drops and Motrin, and advised Gusman that he should not place foreign objects in his ears.  Id.

On February 26, 2003, Gusman was seen by PA Terrero-Leibel for lower back pain.  (Rec. Doc. 24, Medical Records at 16).  During this examination, Gusman stated that his ears did not hurt, but that he heard "bubbling: noise and "his hearing is low."  Id. PA Terrero-Leibel ordered an in-house audio examination.  Id.

On April 9, 2003, Gusman was seen by PA Terrero-Leibel regarding continued hearing problems.   (Rec. Doc. 24, Medical Records at 16).  PA Terrero-Leibel diagnosed Gusman with fluid behind the tympanic membrane, and noted in the record that she would consult with the Clinical Director about a follow-up examination with an ear, nose and throat ("ENT") doctor.  Id.; see also Rec. Doc. 24 at 39, Consultation Sheet.  Gusman's baseline audio hearing test was also performed on April 9, 2003.  (Rec. Doc. 24, Medical Records at 17).  It was determined that Gusman presented hearing loss and that the test would be repeated again on April 11, 2003.  Id.

On April 11, 2003, a manual test of Gusman's hearing was conducted.  Id.  It was determined that Gusman suffered from pronounced hearing loss and should be referred to an ENT as soon as possible.  Id. at 18.  On April 30, 2003, Gusman was seen by PA Terrero-Leibel for a follow-up to the hearing tested performed.  Id.  The results were explained to him and he was informed that a request for a consultation with an ENT was pending.  Id.

On May 19, 2003, Gusman was seen by PA Terrero-Leibel for a complaint that "his good ear is bothering him a lot".  (Rec. Doc. 24, Medical Records at 19).  He stated that it's like listening to "a bell from when you leave a door open from the car."  Id.  PA

Terrero-Leibel diagnosed Gusman with middle ear fluid, and prescribed chlorpheniramine ("CTM") and Motrin.  Id.

On May 29, 2003, Gusman was seen by PA Terrero-Leibel for a follow-up on his ear pain.  Terrero-Leibel diagnosed Gusman with possible allergies and prescribed Benadryl.  Id.  On June 3, 2003, Gusman was seen by Dr. Frank, an outside ENT specialist.  (Rec. Doc. 24, Medical Records at 20).

On June 10, 2003, Gusman was seen by PA Roces and "demand[ed] surgery." (Rec. Doc. 24, Medical Records at 20).  PA Roces diagnosed Gusman with middle ear fluid and prescribed Benadryl.  Id.  He also noted that Gusman was "evaluated by ENT (outside); waiting for consult/note from outside ENT."  Id.

On June 13, 2003, Dr. Frank's report was received by the medical department. (Rec. Doc. 24, Medical Records at 21).  He found the following:

> We saw Mr. Gusman in my office on 6/3/03.  He complains of decreased hearing in both ears, worse in the left ear, since having an earache early this year.  He has been on antibiotics and ear drops on several occasions.  He does not have any ear discharge.
>
> On examination, he shows a bilateral mixed hearing loss, which is worse for the left ear.  Tympanograms were type B bilaterally.  Otoscopic examination revealed air fluid levels in the right middle ear space clearly seen through a fairly translucent although retracted right tympanic membrane.  The left tympanic membrane is dull and has a deep retraction pocket in the pars

8

flaccida.  The nasal exam revealed a left sided septal deviation and some nasal congestion.  The pharynx was clear.

I believe that his hearing loss is secondary to a bilateral middle ear effusion, although it appears that this individual my have had middle ear problems for quite a long time.  The hearing loss is mixed and even if the fluid problem resolves he will have a hearing loss since there is quite a significant sensorineural hearing loss component especially for the left ear.  Also the conductive component for the left ear is significant so, besides the middle ear fluid there might be some degree of tympanosclerosis in the left ear.

My recommendation is that we proceed with a left tympanoplasty and ventilation tube insertion and a right ventilation tube insertion.  Even after this the patient's hearing may be impaired to the point he may subsequently require a hearing aid.

Rec. Doc. 24, at 47, June 3, 2003 letter of diagnosis from Dr. Frank.

On June 15, 2003, Gusman was seen by PA Roces for ear pain.  (Rec. Doc. 24, Medical Records at 21).  Roces noted that the Plaintiff was "very childish and forcing himself to cry but no tears seen" and that Plaintiff was "very manipulative" and "wants to go to an outside hospital."  Id.  PA Roces diagnosed Plaintiff with possible otalgia (pain in the ear) and prescribed Benadryl and Motrin.  Id.

On June 17, 2003, Gusman's ENT surgery request was reviewed and approved by the Utilization Review Committee.  (Rec. Doc. 24, Medical Records at 22).  On June 23, 2003, Gusman was seen by PA Reid, complaining that his "ear [was] going to explode."

(Rec. Doc. 24, Medical Records at 22).  He was diagnosed with otalgia and prescribed Motrin and Benadryl.  Id.

On June 24, 2003, Gusman was seen by PA Manenkoff for a follow-up visit.  Id. PA Manenkoff diagnosed Gusman with otitis media and prescribed Tylenol, Cipro and Zantac.  Id.  On July 6 and 14, 2003, Gusman was seen by PA Roces and requested a refill of his medications.  (Doc. 24, Medical Records at p. 23).  Roces prescribed Tylenol and Benadryl.  Id.

On July 18, 2003, Gusman was seen by PA Manenkoff for ear pain.  (Rec. Doc. 24, Medical Record at 24).  PA Manenkoff diagnosed Gusman with TMJ with referred pain, and prescribed Indocin.  Id.  On July 24, 2003, Gusman was seen by PA Murphy for ear pain.  (Rec. Doc. 24, Medical Records at 25).  PA Murphy diagnosed Gusman with chronic otitis media and prescribed Motrin.  Id.

On July 28, 2003, Gusman was taken to Divine Providence Hospital, in Williamsport, Pennsylvania, where Dr. Frank performed Gusman's recommended ear surgery.   (Rec. Doc. 24, Operative Report at 42-46).  Upon his return to FCI-Allenwood from surgery, Gusman was seen by Dr. Migliorino, who prescribed Augmentin, Tylenol #3, and Tylenol for Gusman.  (Rec. Doc. 24, Medical Records at 26).  Dr. Migliorino

also scheduled Gusman for a follow-up visit with Dr. Frank.  Id.  On July 29, 2003, the Utilization Review Committee approved Gusman's follow-up visit with Dr. Frank.  (Rec. Doc. 24, Medical Records at 25).

On August 3, 2003, Gusman was seen by PA Manenkoff for his surgery follow-up. (Rec. Doc. 24, Medical Records at 26).  PA Manenkoff noted that while the wound was healing well and he could see the right ear tube clearly, he could not see the left ear ventilation tube.  Id.  PA. Manenkoff removed sutures from above Gusman's left ear, and referred Gusman to Dr. Migliorino to "ascertain proper placement of tube" and to determine whether there was a need for a follow-up visit with an ENT sooner.  Id.  Also, on August 3, 2003, Gusman was seen by PA Roces,  requesting something for pain. (Rec. Doc. 24, Medical Records at 27).  He was prescribed Motrin.  Id.

On August 4, 2005, Gusman was seen by Dr. Migliorino for the follow-up visit noted by PA Manenkoff on August 3, 2003.  (Rec. Doc. 24, Medical Records at 28).  Dr. Migliorino contacted Dr. Frank, and was told that the left ear tube was obscured by Gelfoam which would disappear with time.  Id.

On August 24, 2003, Gusman was seen by PA Murphy, requesting pain medication and something for congestion.  Id.  PA Murphy prescribed Actifed and Motrin.  Id.

On August 25, 2003, Gusman was examined by Dr. Frank for his four week follow-up.  (Rec. Doc. 24, Medical Records at 25).  Dr. Frank noted the following:

> We saw Mr. Gusman on 8/25/03 he is status post bilateral ventilation tubes insertion and left tympanoplasty.  Today the patient complains of clear nasal discharge, hollow feeling in his ears and persistent hearing loss.  He has been explained that prior to the operation the audiogram recorded a significant sensorineural hearing loss bilaterally which is permanent.
>
> Today a repeat audiogram was performed which revealed slight improvement in the hearing thresholds that indicates that the tubes are maintaining the middle ears dry, and there has been a slight improvement in the conductive component of the hearing loss.  However, the sensorineural hearing loss component will be permanent.  We are recommending a hearing aid evaluation for this patient hoping that the system may approve a hearing aid for him.  A hearing aid will definitely improve his communication skills.  I also advised that he maintains protection of his ears while exposed to water.  It would also be advisable that ear plugs are supplied to him.
>
> His examination today revealed his ventilation tubes to be in place, patent and dry.  All the operative sites have healed nicely.  Nasal examination revealed purplish mucosa, which is suggestive of allergic rhinitis.  I am recommending that Mr. Gusman is prescribed with an appropriate antihistamine for this problem.
>
> I would like to reevaluate him in six months.

Rec. Doc. 24, at 55, August 26, 2003 evaluation letter from Dr. Frank.

12

On September 10 and 21, 2003, Gusman was seen by PA Roces requesting renewal of his CTM medication. (Rec. Doc. 24, Medical Records at 29-30). Both times Gusman's prescriptions were renewed. Id.

On October 7, 2003, Gusman was seen by PA Murphy for leg pain. Gusman did not mention anything about his ears. (Rec. Doc. 24, Medical Records at 31). Also, on October 7, 2003, the Utilization Review Committee approved Gusman for a follow-up with an ENT for a hearing aid evaluation. Id.

On October 10, 2003, Gusman was seen by PA Murphy, complaining about pain in his hip. (Rec. Doc. 24, Medical Records at 32). He did not complain about his ears. Id. PA Murphy prescribed Naprosyn. Id.

On October 20, 2003, Gusman was seen by PA Powanda, complaining that the Naprosyn was not helping the pain in his hip. Id. PA Powanda changed Gusman's pain medication to Motrin. Id. There were no complaints about his ears. Id.

On October 22, 2003, Gusman was evaluated for his hearing aid. (Rec. Doc. 24, at 52, 53, Evaluation and Hearing Aid Order form). He returned to FCI-Allenwood with an order form for his hearing aid. Id.

On October 28, 2003, PA Powanda ordered refills for Gusman's CTM medication. (Rec. Doc. 24, Medical Records at 33).  On November 12, 2003, Gusman was ordered a Motrin refill by PA Powanda.   Id. Refills for Gusman's CTM medication were also ordered on November 12 and 22, 2003.  Id. at 34.

On November 28, 2003, Gusman was provided hearing aids by Health Services Administrator Francisco Feliz.  Id.  On December 14, 2003, PA Powanda ordered a refill of Motrin for Gusman.  (Rec. Doc. 24, Medical Records at 35).  On December 29, 2003, PA Powanda diagnosed Gusman with nasal congestion and prescribed a CTM.  Id.

On January 14, 2004, PA Powanda ordered a refill of Motrin, at Gusman's request, for his hip pain.  (Rec. Doc. 24, Medical Records at 36).  Gusman did not complain about his ears.  Id. On February 12, 2004, PA Powanda ordered a refill of Gusman's CTM medication, at Gusman's request.  Id.

On February 24, 2004, Gusman was seen by Dr. Frank for his six month follow-up visit. Id.  Dr. Frank noted the following:

> We saw Mr. Gusman on follow up on 2/24/04.  He complains of increased humidity feeling in his ears, and he relates that to the fact that he is confined in a humid and cold cell.  He also refers that the earplugs that have been provided do not fit properly and he worries about exposing his ears to water.

14

On exam, both tubes are in place and patent and the surgical site is completely healed in the left ear.  Nasal passages, oral cavity and pharynx were unremarkable.

I feel Mr. Gusman should continue to avoid water in the ears and would be advisable that he obtains earplugs that fit his ear canals properly to avoid exposure to water.  Also, he should be placed in a dehumidified environment to prevent infection settling in the ear canal that could enter through the ventilation tube and to the middle ear.  He should be rechecked in six months.  I will not be available at that time since I will be leaving the area. He can continue follow-up appointments with Dr. William Banks, who has agreed to continue the care of my patients.

Rec. Doc. 24, at 57, February 24, 2004, follow-up letter from Dr. Frank.

On March 9, 2004, Gusman was transferred from FCI-Allenwood to SCI-Schuylkill. (Rec. Doc. 24, Medical Records at 37).

**Discussion**

A.    **Eighth Amendment**

The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)(citing Estelle vs. Gamble, 429 U.S. 97 (1976)). In order to establish a claim based on the Eighth Amendment, an inmate must allege acts or omissions by prison officials sufficiently harmful to evidence deliberate indifference to a serious medical need.

15

See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003).

In the context of medical care, the relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective element) to (2) plaintiff's serious medical needs (the objective element). Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987); West v. Keve, 571 F.2d 158, 161 (3d Cir. 1979). Because only egregious acts or omissions can violate this standard, mere medical malpractice can not result in an Eighth Amendment violation, nor can disagreements over a prison physician's medical judgment. White v. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990).

A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment . . ." Estelle v. Gamble, 429 U.S. 97, 106, (1976). "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.   At most it is medical malpractice[.]"   Id. at 107. "Allegations of medical malpractice are not sufficient to establish a Constitutional violation."  Spruill, 372 F.3d at 235.  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."   Brown v.

16

Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).  In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment.  Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); see McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician.  Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa. 1996), aff'd, 101 F.3d 691 (3d Cir. 1996).  The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires.  Farmer, 685 F. Supp. at 1339.

The objective component of an Eighth Amendment claim, i.e., whether a plaintiff's medical needs were serious, has its roots in contemporary standards of decency.  Hudson v. McMillian, 503 U.S. 1 (1992).  A medical need is serious if it is one that has been

17

diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991); Monmouth County Correctional Institution Inmates, 834 F.2d at 347; Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981); West v. Keve, 571 F.2d 158, 162-63 n.6 (3d Cir. 1978). The serious medical need element contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.  See Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 347; Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984); Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977).  Not every injury or illness invokes constitutional protection -- only those that are serious have that effect. Additionally, a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when the inmate is already receiving treatment from the prison's medical staff.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

A review of the documentation submitted by Defendants reveals that Plaintiff was seen and treated in excess of thirty times between January 17,  2003, the date he first starting complaining of ear pain, and March 9, 2004, the date Plaintiff was transferred. Plaintiff's medical records show that he was prescribed several different anti-inflammatory

and pain medications, prescribed various dosages of those medications, referred to, and was seen by a specialist on several occasions,  received an operation for his ear pain, received hearing aids and continual follow-up treatment.    (Rec. Doc. 24, Medical Records, Consultation Records, and Physician's Notes).  Indeed, the record establishes meaningful efforts by Defendants to provide Plaintiff with necessary medical care, and an attendant mental state that falls woefully short of deliberate indifference.

Plaintiff has failed to present evidence from which a reasonable jury could conclude that Defendants possessed the culpable mental state necessary for Eighth Amendment liability to attach.  There is insufficient proof in the record for a fair-minded jury to conclude that Defendants were deliberately indifferent to Plaintiff's medical needs.  See Estelle, 429 U.S. at 97, 106; Monmouth County Correctional Institution Inmates, 834 F.2d at 346; West, 571 F.2d at 161.  Indeed, the extent and quality of medical attention that Defendants provided Plaintiff precludes a finding of deliberate indifference.

Plaintiff admits that he was seen and treated by medical personnel throughout his incarceration at the FCI-Allenwood.  At no time does Plaintiff allege that he was refused treatment.  He admits that "there were antibiotics, pain medications and antihistamines dispensed" as treatment for his ear infection and pain.  (Rec. Doc. 27).  He also states that originally, he was "only given stop-gap undefined & inappropriately unspecific

19

Amoxicillin as a systemic remedy to his then ear infection. . . .Otherwise, [he] was only treated for 'allergy' and 'pain'." Id.  Such allegations, however, at best, amount to a subjective disagreement with the treatment decisions and medical judgment of the medical staff at the prison.  However, as simple negligence cannot serve as a predicate to liability under the Eighth Amendment, Hudson v. Palmer, 468 U.S. 517 (1984), Plaintiff's civil rights complaint fails to articulate an arguable claim, and Defendants are entitled to judgment as a matter of law.  See White, 897 F.2d at 108-110.

## B.    **Respondeat Superior**

Claims brought under § 1983[4] cannot be premised on a theory of respondeat superior.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim. See Rizzo v. Goode, 423 U.S. 362 (1976); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976). As explained in Rode:

> A defendant in a civil rights action must  have personal involvement in the alleged wrongs. . . . [P]ersonal involvement can be shown through

---

4. Since a Bivens action is the federal counterpart to actions filed under 42 U.S.C. § 1983, Paton v. LaPrade, 524 F.2d 82 (3d Cir. 1975), we may properly look to § 1983 cases in considering Bivens actions. Brawer v. Horowitz, 535 F.2d 830, 834 (3d Cir. 1976).

> allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

Rode, 845 F.2d at 1207.

An application of the above standards to Gusman's complaint clearly shows that he has failed to set forth a cognizable claim against Defendants Warden Yates and Health Services Administrator Feliz. Aside from naming these Defendants in the caption of the complaint, Gusman sets forth no allegations of personal involvement by these Defendants. There is no evidence of record that such Defendants were personally involved in any of the alleged incidents of deliberate indifference. Thus, it is apparent that Plaintiff is attempting to impose liability on the basis of respondeat superior. In fact, Plaintiff acknowledges that he is suing these two Defendants in their supervisory capacities as Warden and Health Services Administrator. (Rec. Doc. 27 at 18-21). Moreover, these Defendants, both non-medical personnel, cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when the inmate is already receiving treatment from the prison's medical staff. See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004); Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). Thus, Defendants Warden Yates and Health Services Administrator Feliz are entitled to judgment as a matter of law.

21

Moreover, with respect to any claim Plaintiff makes for injunctive relief, the adjudicatory power of a federal court depends upon "the <u>continuing</u> existence of a live and acute controversy." <u>Steffel v. Thompson</u>, 415 U.S. 452, 459 (1974) (emphasis in original). "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." <u>Id.</u> at n.10 (citations omitted). "Past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding injunctive relief if unaccompanied by continuing, present adverse effects." <u>Rosenberg v. Meese</u>, 622 F. Supp. 1451, 1462 (S.D.N.Y. 1985) (citing <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-96 (1974)).

Furthermore, "[a]bsent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred." <u>Wahl v. McIver</u>, 773 F.2d 1169, 1173 (11th Cir. 1985) (citation omitted); <u>see also</u> <u>Carter v. Thompson</u>, 808 F. Supp. 1548, 1555 (M.D. Fla. 1992). The instant Plaintiff is no longer confined in FCI-Allenwood, and there is no reasonable probability that he will be returned to that correctional facility in the foreseeable future. Consequently, since Plaintiff is not suffering any apparent continuing adverse effects as a result of his prior confinement at the FCI-Allenwood, his requests for injunctive relief are moot under the standards set forth in <u>Rosenberg</u> and <u>Wahl</u>.

Finally, to the extent that Plaintiff seeks to bring this action as one under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 <u>et</u> <u>seq</u>., the filing of an administrative tort claim with the appropriate federal agency is a jurisdictional prerequisite to bringing a civil action against the United State for damages for the negligence or wrongful act of any employee of the United States.   <u>See</u> 28 U.S.C. § 2675(a).   The record reveals that Gusman has not filed any administrative tort claim with the Northeast Regional Office of the Bureau of Prisons.   (Rec. Doc. 24, Ex. 2, Declaration of Patricia M. Gotts, Supervisory Paralegal of the Northeast Regional Counsel's Office, Philadelphia, Pennsylvania).   An administrative claim must be presented to the appropriate Federal agency employing the person whose act or omission caused the injury, and have been finally denied by the agency in writing.  If the claim is not presented before commencing suit, the suit must be dismissed even if the claim is subsequently presented.  <u>See</u> <u>McNeil v. United States</u>, 508 U.S. 106 (1993).  Thus, despite Gusman's repeated references to allegations of gross medical negligence and improper medical care, Plaintiff's failure to file an administrative tort claim bars any claim for relief under the FTCA.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.  Defendants' Motion for Summary Judgment (doc. 22) is **GRANTED**. Judgment is hereby entered in favor of the Defendants and against Plaintiff.

2.  Plaintiff's Motion for Appointment of Counsel (doc. 26) is **DISMISSED** as moot.

3.  The Clerk of Court is directed to **CLOSE** this case.

4.  Any appeal taken from this order will be deemed frivolous, without probable cause, and not taken in good faith.

<u>s/ John E. Jones III</u>
JOHN E. JONES III
United States District Judge